# EXHIBIT D


A service of The News Journal

http://www.delawareonline.com/apps/pbcs.dll/article?AID=/20050925/NEWS01/509250361/1006

# Cruel & Unusual

**Brother with two heads: We 'will forever carry his death on our conscience'**

BY LEE WILLIAMS AND ESTEBAN PARRA / The News Journal
09/25/2005

Anthony Pierce was known to cellmates as "the brother with two heads."

Pierce was serving 14 months for a parole violation stemming from a burglary charge at the Sussex Correctional Institution in Georgetown when a small lump appeared on the back of his head. It was January 2001 and a prison doctor employed by a private medical contractor said the marble-size lump was most likely a cyst or an ingrown hair.

Seven months later, when the growth had become like a second head, Delaware's contract prison medical director, Dr. Keith Ivens of Correctional Medical Services, stabbed the bulging tumor five times with an 18-gauge needle, withdrawing a bloody fluid.

Rather than keeping the sample for analysis, Ivens emptied the syringe into a trash can, according to Michelle Thomas, a former prison counselor who was holding Pierce's hand during the examination.

The News Journal gained access to Pierce's medical file through his family, and there was no record of a biopsy performed before cancer ate into the 21-year-old's skull.

Asked about the case in a telephone interview, Ivens said, "I'm trying to remember who Anthony Pierce is." He declined to comment further.

Near the end of Pierce's life, the tumor stretched the skin around his face, pulling his right eye closed, causing muscle spasms and crippling pain. The medical staff still ordered no tests or treatments, claims a lawsuit that Pierce's family filed against Ivens, CMS and the state of Delaware.

On March 22, 2002, Pierce died from a "brain tumor, due to osteosarcoma of the skull," an autopsy report stated.

A six-month investigation by The News Journal shows that the lack of care suffered by Pierce is all too common inside


The News Journal/ROBERT CRAIG
At the infirmary at the Delaware Correctional Center near Smyrna, inmates sleep on the foam pads leaning against the wall. The high number of HIV cases at the state prison led one doctor to quit in disgust.

## Delaware's Deadly Prisons


Infectious disease specialist Dr. Ramesh Vemulapalli worked at the state prison near Smyrna for a little over a year. He believes treatment of AIDS, HIV and hepatitis C is neglected by the system.

Delaware prisons.

AIDS, hepatitis, flesh-eating bacteria and other communicable diseases percolate behind the wire. Inmates in their 20s and 30s die from diseases that people outside prison routinely survive.

Delaware in 2003 had the nation's highest rate of AIDS-related prison deaths, 87 per 100,000 inmates, according to the U.S. Bureau of Justice Statistics report on HIV in state facilities.

Maryland's rate of 54 per 100,000 inmates was the nation's second highest. The 2003 score marks the second time in four years that Delaware's rate for AIDS-related deaths in prison was the nation's highest.

Delaware's small size eliminates the need for city and county jails, so anyone who can't make bail -- regardless of the severity of the charges -- goes to prison. That affects the overall death rate when compared to states that have city and county jails because inmates in Delaware move in and out of prison more frequently, said Dr. Janet Kramer of Wilmington, an expert in prison health care.

With a population of 6,600 inmates in Delaware, three to four inmates should be expected to die in a year, said Kramer. But since January 2000, 90 inmates have died. Given that 2005 is 75 percent complete, that works out to about 18 deaths per year.

Kramer has evaluated more than 40 jails and prisons across the country for the National Commission on Correctional Health Care -- a national group that offers an accreditation program to improve prison medical care.

Kramer said one of the key factors for Delaware's high death rate is that inmates are not screened for disease upon entering the prisons, so medical officials don't know which inmates have AIDS.

"One of the things that doesn't happen here, and there are a few states that require it, there is no hepatitis or HIV screening on admission," Kramer said. "That's something that should be added."

And the state's death rate is higher than actually reported because some gravely ill inmates are quietly released days before they die, the newspaper's investigation shows. Because those inmates did not die in custody, their deaths go unreported to prison regulators.

Pierce's death, for example, was never recorded because he was released to his family a few days before brain cancer



Anthony Pierce with his daughter. Pierce was serving a 14-month sentence for burglary when he developed a cancerous lump on the back of his head. The tumor grew larger than a grapefruit, but Pierce received no X-rays or other tests.



The MRI above was taken in July, seven months after Anthony Pierce's tumor was detected. Ninety percent of the mass was outside the skull while 10 percent protruded into the skull. (Source: Journal of Surgical Neurology, published by Elsevier.)



A letter written from prison by Pierce to his mother and his daughter Sardia on April 12, soon after doctors detected he had a tumor.

killed him.

## Community also at risk

Like other states, Delaware has turned over health care inside its prisons to private companies specializing in inmate medical care.

There are two significant differences, however:

- Whether they have been convicted or are awaiting trial, inmates in Delaware depend on the state for medical care. In states with county and city jails, care in smaller facilities usually is provided through a local hospital or physicians' group.

- National experts say most states employ a medically trained staff to monitor the medical vendors. Delaware does not. Here, the medical vendors oversee death investigations, regulate access to care, and control any complaints that arise over their work.

There are other troubling issues.

Delaware's care of one inmate, a convicted child molester with a serious heart ailment, was so bad a Superior Court judge ordered him released early so he could get care at a private hospital. Kenneth DeRoche, 56, was sentenced to eight years but was freed in 2003 after serving only three years. He now lives in rural Kent County, where he works as a well-drilling consultant.

And inadequate care in the state's prisons poses a growing public health danger to communities outside those prisons, said Dr. Ramesh Vemulapalli, an infectious disease specialist practicing in Dover. Vemulapalli worked at the Delaware Correctional Center near Smyrna for a little more than a year and treated at least 100 HIV-positive inmates before quitting in disgust in 2003.

He said inmates moving through cycles of confinement, release and arrest are developing new strains of the virus, and those strains are passed to family members and sexual partners, particularly in the tough neighborhoods of Wilmington.

State Correction Commissioner Stan Taylor said he had no idea Delaware's prison death rates were so high. But when pressed to offer some explanation, Taylor added:

"The inmate population tends to be a population that comes to us with a difficult medical history: substance abuse, tattoos, risky sex, a lot of drug behavior. They don't take care of themselves."



Michelle Thomas, who worked in a prison drug-abuse program, watched in horror as inmate Anthony Pierce's tumor grew without treatment.



"The inmate population comes to us with a difficult medical history: substance abuse, tattoos, risky sex, a lot of drug behavior. They don't take care of themselves."

State Correction Commissioner Stan Taylor



Bruce MacGloan, a former nurse at Gander Hill prison, said after-hours emergencies were treated by on-call doctors who rarely sent inmates to outside hospitals.

Vemulapalli countered that Taylor didn't seem to care whether AIDS patients received care.

"Leadership in prisons has no willingness to treat HIV or hepatitis C patients," Vemulapalli said. "It begins to trickle down, this attitude of neglect, from supervisors to nurses."

Even when AIDS is identified, Vemulapalli said, AIDS drugs are not properly administered.. Antiviral drugs must be given at specific times and in strict accordance with a physician's instructions, he noted. He believes his instructions were rarely followed.

Taylor disagreed. "They're properly administered, as far as I know."

Vemulapalli said he would prescribe a regimen of medication and find out later that only half of the drugs had been dispensed. On one occasion, an inmate did not receive any drugs.

"By not giving the medication on time," he said, "they're making the patient's condition worse."

HIV multiplies more easily if a patient misses doses of an antiviral medication, leading to additional mutations, some more resistant to antivirals. These mutations are the most troubling problem to experts tracking how HIV is transmitted among inmate populations -- and to the public at large.

Dr. Robert Cohen, an expert in prison health care whom state and federal courts have appointed to monitor prisons in five states, said all states are constitutionally required to provide adequate medical care for inmates. If Delaware "outsources" that responsibility, it is still obligated to monitor its medical vendors, Cohen said.

That doesn't happen. The Medical Society of Delaware, a physicians group, is occasionally called -- at the warden's discretion -- to investigate an inmate death. Yet its investigation is led by the vendor's medical director. And the society's report is confidential under Delaware law; it remains in the custody of the medical vendor.

"It's surprising to me that Delaware just lets the vendor do it by themselves," Cohen said.

Under the current $25.9 million annual contract with Correctional Medical Services, state prison officials are indemnified against wrongful death and medical malpractice lawsuits. If an inmate or survivor sues the state, the medical vendor pays the state's attorney fees and any settlement.

However, Cohen said, the indemnification will not protect the



The News Journal/ROBERT CRAIG
"The system is such that if you find fault, you're disloyal," said Dr. Owen Lugar, a psychologist who worked for CMS as the state's mental health director.

state from federal civil rights lawsuits filed by inmates or their survivors.

"It's going to cost the state a lot of money in the long run," Cohen said.

Added Jules Epstein, associate professor at the Widener University law school: "When a person loses their freedom to the government, the government has an affirmative obligation to take care of them -- feed, clothe, and provide basic medical care. The gist is necessary medical care. It doesn't mean just enough so they don't die. It means care."

The state can't get off the hook because it hires a private medical contractor, Epstein added. "They [medical vendors] are acting on behalf of the government."

**No-bid contract, or contract 'extension'?**

Correctional Medical Services of St. Louis held Delaware's $12.45 million annual contract from 2000 to 2002, when it asked to be released from its obligations. At that point, Taylor accepted a bid from First Correctional Medical, a Tucson, Ariz., firm, for a $16.44 million annual contract.

FCM left the state in July after explaining that it wanted to be released from its contract. FCM's owner and founder, Dr. Tammy Kastre, did not return numerous calls for comment. Taylor would not discuss reasons for the departure, but added that FCM owes thousands of dollars in unpaid bills to private clinics, hospitals and physicians. The exact amount is in dispute.

"The DOC [Department of Correction] doesn't owe anybody anything," Taylor said. "It's a matter of sorting it all out."

Some former inmates have received bills at home from local hospitals and clinics for care they received while in the state's custody.

Taylor said he was forced to move fast to find a replacement. He turned to a company he knew well: CMS, the same company that cared for Anthony Pierce while his tumor grew to the size of a grapefruit.

Despite the size of the contract, $25.9 million, the state awarded it to CMS without seeking competitive bids, Taylor said.

"The decision-making process, with FCM leaving, resulted in my needing to make a decision faster than going with a large bid process," said Taylor. "We sole-sourced it, and made the decision with counsel from the governor's office and Legislature."

Delaware Gov. Ruth Ann Minner said the contract awarded to CMS was not a "no-bid" contract, as described by Taylor. She argued that, even though CMS asked to be released from its contract in 2002, forcing the state to hire another vendor, CMS' return to Delaware came by piggy-backing on the contract of the vendor it replaced, FCM.

"It was an extension on the contract," Minner explained. "They picked up from the firm who left. They [CMS] took the contract from the prior firm [FCM]. The contract didn't change."

Since FCM secured the original contract through competitive bidding, Minner reasoned that the transaction was not a no-bid deal. "They agreed to meet all the requirements of the original contract," she said.

It's unclear how the "extension" resulted in an annual price hike of $9.5 million. Taylor declined to answer that question.

Sen. James T. Vaughn, D-Clayton, who chairs the Senate corrections committee and served as Department of Correction commissioner from 1976 to 1979, was not told about the deal with CMS until after the contract was signed -- or, under the governor's version, extended.

"I didn't know," said Vaughn, who said he's concerned about claims that CMS already is cutting the level of service. "That's why I asked for copies of contracts. It's going to be one of my questions."

Rep. John Atkins, R-Millsboro, chairman of the House corrections committee, said he, too, did not know that CMS was awarded the contract without a bid. But he believes health care in the state's prisons is excellent. "I'd say the inmates are getting better care than the guards watching them."

Minner, too, said health care is superb inside prison walls.

CMS -- not the state -- determines what level of care to provide inmates; Delaware negotiated the same terms with FCM.

Yet Minner said the state does not need medically trained employees to oversee the actions of its accredited prison medical vendors, "because we contract with them to do that -- and we have a group to check on them periodically."

**Facing lawsuits**

CMS provides medical care for some 285,000 inmates in more than 360 prisons in 25 states. It is named in many lawsuits filed in state and federal courts across the country,

although the exact number of suits filed against the 25-year-old St. Louis firm is difficult to obtain.

There have been 53 lawsuits filed in Wilmington's U.S. District Court against CMS since 2000. Twelve are still active. Former CMS medical director Ivens, has been sued 15 times in U.S. District Court by Delaware inmates or their families. Each of the federal lawsuits against Ivens has been dismissed, but at least two state Superior Court court cases naming Ivens as a defendant remain active.

Michelle Thomas, who worked for Spectrum, a CMS subsidiary that provided substance-abuse treatment to inmates, helped establish the treatment program that inmate Pierce attended before he contracted the cancerous growth on his head.

"They're the scum of the earth," Thomas said of her former employer. She quit CMS shortly after Pierce died. Thomas said she watched in horror as Pierce's tumor grew. Thomas said she repeatedly questioned the medical staff about the lack of treatment, but she never got an answer.

"That boy was growing another head," she said. "It was the most grotesque thing I have ever seen in my life. ... All of us who worked there will forever carry his death on our conscience."

Taylor wouldn't comment on Pierce or any other individual case. "That's a matter to be played out in court," he said.

FCM, too, is the frequent target of inmate lawsuits alleging inadequate health care. And neither CMS nor FCM would comment generally on the suits filed against them. But Ken Fields, a senior vice president, partner and spokesman for CMS, said the company "vigorously" disputes the claims made by Pierce family attorney Stephen Hampton of Dover.

"We can affirmatively tell you that he was seen frequently by health care staff that took his care seriously," Fields wrote in a statement faxed to The News Journal. "To view it retrospectively, using information that was not available to the caregivers at the time, takes this out of context."

Fields told The News Journal that he would not allow any current CMS employee to be interviewed by the newspaper. And he cautioned that the public should not be easily swayed by complaints from former employees, or inmates and their families. Anecdotal evidence, he said, does not negate the good work his company does.

"I think as members of the public understand the facts about the level of care provided to inmate patients, and understand the lack of medical care before they entered custody, and

understand the facts that 80 percent have a history of substance abuse and lack of access to medical care, they will see firsthand commitment of CMS professionals, who choose to go to work every day because they believe a level of care needs to be provided to inmate patients, and appreciate the role CMS plays in this important public health issue," Fields told the newspaper.

Yet Dr. Sitta Alie, the former medical director for FCM, who, like many of its employees, was hired by CMS when it took control of Delaware institutions in July, said this about the two companies: "They're both awful." Alie was an employee of FCM when interviewed by the newspaper. Contacted again after CMS took control, she declined to comment further.

**'Less services, more money'**

Before 1978, Delaware's Department of Correction had a long tradition of hiring its own doctors and nurses, or guards who were former military medics, to provide health care for adult and juvenile offenders. But two years after the 1976 U.S. Supreme Court ruling that inmates deserve health care equivalent to community standards, Delaware signed a contract with Sacred Heart Hospital of Chester, Pa., to provide care for state prisoners.

In 1981, then Correction Commissioner John L. Sullivan hired Claymont-based Prison Health Services, following a national trend of states privatizing prison medical services. The new company was founded by Delaware nurse Doyle H. Moore, who had been Sacred Heart's prison health care program coordinator. A year later, PHS ended its 23-month contract, citing a spike in incarceration rates. Eleven private prison companies bid for the open contract.

The Medical Society of Delaware's prison health committee started playing an oversight role in 2000 when it took positions against smoking and overcrowding in the state's nine correctional facilities. That same year, Delaware signed a contract with the nation's largest prison medical provider, CMS.

Cohen said Delaware, like other states, has negotiated its way into trouble by hiring medical vendors to provide health care in prisons.

"Any of these companies, with a risk-based contract -- less services, more money -- are extremely likely to go wrong," Cohen said. "I'm not aware of anywhere they've gone right."

Decisions about performing medical tests or procedures on inmates in Delaware are not made here, but by company executives at the corporate offices. When an inmate dies in Delaware, the autopsy -- if there is one -- and other

investigative reports go to the vendor, not to any state official. And Taylor does not review inmate autopsies.

After an inmate dies, families get a short phone call from the prison. The public is alerted with a short press release, most of which explains that the inmate's death occurred after "a lengthy illness" -- in some cases when an inmate has been incarcerated less than a year.

**Sleeping on the floor**

The Delaware Correctional Center near Smyrna is like a small city, housing 2,400 inmates enclosed by 1.5 miles of razor wire. Along the tar road running through the middle of DCC, which is called "the boulevard," small groups of inmates gather.

On a hot day in June, it was nearly 100 degrees inside "B-unit," where pretrial detainees are held. The wing has no air conditioning. One hundred and eighty men, mostly from Kent and Sussex counties, were locked in their cells. These detainees do not mix with the convicts. They're marched to one of the four chow halls at a separate time.

The prison's kitchen appears cleaner than the infirmary. The place smells musty, and the 44 beds are always full.

Men sleep on the floor on foam pads. Food is served in the rooms. In summer, the heat is suffocating.

In spite of the deaths and disease afflicting the state's prisons, Taylor said health care is better now than when he joined the department as a guard in 1976. Appointed by former Gov. Tom Carper in 1995, Taylor said he was unaware of charges by some former medical staffers: Inmates with bleeding rectums, severe head injuries, open wounds -- even one suffering a heart attack -- not being allowed to go to the hospital. On-call contract physicians, these former staffers said, refused to approve critical transfers to a hospital.

"If that were true," Taylor said, "that would concern me."

**'This should be exposed'**

Bruce E. MacGloan, a former Navy corpsman and emergency room nurse now working at the Veterans Administration, said he was shocked by what he saw at Gander Hill prison in Wilmington, where he worked for 18 months before quitting.

Along with four other nurses, MacGloan worked the 3-to-11 p.m. shift from mid-2001 to January 2003. One nurse was assigned to screening new arrivals. One stayed in the infirmary. Three nurses delivered drugs to three wings. Each would medicate 240 people.

If an emergency occurred after hours, the nurses had to phone an on-call doctor.

It was rare for MacGloan and the nursing staff to meet an on-call doctor. Most refused to allow inmates to be transferred to civilian hospitals. MacGloan remembers every refusal.

Raphael Soto, then 63, had a history of heart problems and diabetes and had undergone bypass surgery. When Soto reported chest pains, MacGloan knew it was serious.

"He was having an active heart attack," MacGloan said. "I know this because I ran a strip [an electrocardiogram] on him. I told the doc on the phone he was having a heart attack, but I was not allowed to transport to the hospital. I was told to give nitro pills. He didn't die, but it was close."

Other refusals also stand out.

"There were people bleeding from the rectum and they wouldn't send them out for a scope," MacGloan said. "We had one guy who fell down and split his head open, down to the bone. He should have been sent to the hospital immediately. They just put a steri-strip [a butterfly bandage] on him. He never got stitches."

MacGloan never received any training – medical, safety or security – while working in the prison.

"I was shown a book of accreditation standards, but was never told the standards or allowed to read the book," he said. "I really feel all of this should be exposed. It's all about out-sourcing to these companies. I had to struggle daily to provide care. We were always rushed. We'd be lucky to get lunch."

MacGloan and other ex-medical staffers interviewed by The News Journal said there is no accountability in the prisons.

"The system is such that if you find fault, you're disloyal," said Dr. Owen Lugar, a psychologist who worked for CMS as the state's mental health director for one year. "The environment inside the prison is predicated on 'us versus them.' Them is the public. Us is those with a badge. No one calls the system into account."

*Contact investigative reporter Lee Williams at 324-2362 or lwilliams@delawareonline.com.*

*Contact Esteban Parra at 324-2299 or eparra@delawareonline.com.*

Copyright © 2005, The News Journal. Use of this site indicates your agreement to the Terms of Service (updated 06/07/2005)